IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| JARRETT CIVELLI; CHRISTOPHER ROSING; and JEFFREY HAAGENSON, individually and on behalf of all other similarly situated persons, | Case No.: 3:23-cv-01739-AN |
| Plaintiffs, | OPINION AND ORDER |
| v. | |
| LUMEN TECHNOLOGIES, INC.; CENTURYLINK COMMUNICATIONS, LLC; QWEST BROADBAND SERVICES, INC. d/b/a CENTURYLINK; QWEST SERVICES CORPORATION; QWEST CORPORATION d/b/a CENTURYLINK QC; and Q FIBER, LLC d/b/a QUANTUM FIBER, | |
| Defendants. | |

Plaintiffs bring this class action lawsuit on behalf of themselves and all other similarly situated persons based on allegations that an internet service provider broke its promise to provide customers with a set "Price For Life." Specifically, plaintiffs Jarrett Civelli, Christopher Rosing, and Jeffrey Haagenson allege that defendants CenturyLink Communications, LLC; Qwest Broadband Services, Inc. d/b/a CenturyLink; Qwest Services Corporation; Q Fiber, LLC d/b/a Quantum Fiber; and Qwest Corporation d/b/a CenturyLink QC (collectively, "CenturyLink") and Lumen Technologies, Inc. ("Lumen") entered "Price For Life" agreements with customers that guaranteed a set monthly fee for the duration of each of those customers' service plans. Defendants allegedly violated those agreements by unceremoniously raising those customers' prices and then lying about their actions. Defendants have now filed a motion for partial dismissal. Lumen argues that it should be dismissed from this case entirely for lack of personal jurisdiction. All defendants additionally argue that the Court should dismiss plaintiffs' claims for (1) violation of the Oregon Unfair Debt Collection Practices Act ("UDCPA") under Oregon Revised Statutes ("ORS") § 646.639, and (2) unjust enrichment. Defendants do not challenge plaintiffs' remaining

1

claims, for breach of contract and violations of the Unlawful Trade Practices Act under ORS § 646.608. After reviewing the parties' filings, the Court finds this matter appropriate for decision without oral argument. *See* Local R. 7-1(d). For the reasons stated below, Lumen's motion to dismiss for lack of personal jurisdiction is GRANTED, and the remainder of defendants' motion to dismiss is DENIED.

## LEGAL STANDARD

### A.    Motion to Dismiss for Lack of Personal Jurisdiction

A defendant may move to dismiss an action for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). The plaintiff then "bears the burden of demonstrating that jurisdiction is appropriate." *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015) (quoting *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004)). If a "court decides the motion without an evidentiary hearing, . . . then 'the plaintiff need only make a prima facie showing of the jurisdictional facts.'" *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008) (quoting *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990)). Even so, the plaintiff "cannot simply rest on the bare allegations of its complaint." *Schwarzenegger*, 374 F.3d at 800. When a defendant "disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction," they are said to present a "factual attack." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Id.* At the same time, the Court must accept as true all uncontroverted allegations in the complaint and must resolve conflicts regarding statements contained in affidavits in the plaintiff's favor. *Ranza v. Nike*, 793 F.3d 1059, 1073 (9th Cir. 2015).

### B.    Motion to Dismiss for Failure to State a Claim

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-

2

moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The court must draw all reasonable inferences from the factual allegations in the plaintiff's favor. *Newcal Indus. v. Ikon Off. Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need not, however, credit a plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

## BACKGROUND

### A.    Jurisdictional Background

#### 1.    *Jurisdictional Allegations*

Plaintiffs allege in the first amended complaint, which is the operative complaint, that Lumen "is a Louisiana corporation with its principal place of business . . . [in] Monroe, Louisiana," and that "[i]t is registered as a foreign business corporation with the Oregon Secretary of State." 1st Am. Compl. ("FAC"), ECF 54, at ¶ 14. Plaintiffs allege that Oregon has jurisdiction over Lumen for three reasons. *Id.* "First, in 2019, CenturyLink, Inc."—Lumen's predecessor—"consented to jurisdiction in Oregon on behalf of any parent or subsidiary company that would reasonably be expected to comply with its previous agreements with the State of Oregon." *Id.* Second, Lumen "has on at least three occasions intentionally bid to provide government subsidized internet services . . . in Oregon, and is so providing internet services to Oregonians

3

under one or more of those contracts." *Id.* Third and "[f]inally, on information and belief," plaintiffs allege that Lumen "operates and controls CenturyLink's operations, including its website, marketing materials, and provision of residential Internet services in Oregon and other states." *Id.* Plaintiffs also allege generally that the Court has personal jurisdiction over all defendants because "each Defendant conducted regular, sustained business activities in the State of Oregon[;] . . . affirmatively registered in Oregon to perform business activities[;] has marketed, advertised, and operated its business within the State of Oregon[;] and has entered into contracts with Oregon consumers." *Id.* ¶ 22.

2.     *Additional Jurisdictional Information*[1]

a.     CenturyLink, Inc.

Turning to the parties' submissions, the jurisdictional inquiry begins here with Lumen's predecessor, CenturyLink, Inc. *See* Decl. of Joan Randazzo Supp. Defs. Mot. ("Randazzo Decl."), ECF 63, at ¶ 4. CenturyLink, Inc. was a Louisiana-based corporation. *Id.* ¶ 3. In April 2020, CenturyLink, Inc. and its subsidiaries, including any "controlled subsidiary that will or has done business in the State of Oregon" entered into an Amended Assurance of Voluntary Compliance ("AVC") with the State of Oregon and the Oregon Department of Justice ("DOJ") requiring CenturyLink, Inc. to, among other things, refrain from making any false or misleading statements in connection with its sale of internet, television, and telephone services in Oregon. Decl. of Sasha A. Petrova Supp. Defs. Mot. ("Petrova Decl."), ECF 65, at Ex. 1 ("AVC") at 2. CenturyLink, Inc. is defined in the AVC as "a holding company with ownership interests in [the listed] subsidiaries" which "does not itself carry out the activities described in [the AVC]." *Id.* The AVC proceeds to refer to Century Link, Inc. and its subsidiaries collectively as "CenturyLink," but maintains that "[i]t is the parties' intention to bring CenturyLink, Inc., and these related entities within the scope of [the AVC], while incorporating and maintaining these distinctions in the definition of

---

[1] The parties have engaged in jurisdictional discovery as to Lumen, *see* Pls. Unopp. Mot. to Dismiss, ECF 35, and have each submitted evidence in support of their jurisdictional arguments, *see, e.g.*, Decl. of Robert Shannon Supp. Defs. Mot.("Shannon Decl."), ECF 64; Decl. of Sasha A. Petrova Supp. Defs. Mot.("Petrova Decl."), ECF 65; Decl. of Robert Devling Supp. Pls. Resp. ("Devling Decl."), ECF 70. The following facts are based on, and uncontroverted by, these submissions.

'CenturyLink.'" *Id.*

The AVC provides that "[j]urisdiction is proper because CenturyLink transacted business within Oregon . . . and has engaged in conduct impacting Oregon or its residents at all times relevant to the claims at issue." *Id.* at 3. It further provides that the "AVC does not constitute evidence or an admission regarding the existence or non-existence of any issue, fact, or violation of any law by CenturyLink for any purpose"; that the "AVC shall not be construed or used as a waiver or limitation of any defense otherwise available to CenturyLink in any action, or of CenturyLink's right to defend itself"; and that the "AVC shall be inadmissible in any case for any purpose, or otherwise used to support any claim, cause of action, right asserted or requested for relief of any kind in any action against [CenturyLink], except in an action to enforce" the AVC itself. *Id.* at 3-4. The AVC does not "grant any third-party beneficiary or other rights to any person who is not a party" to the AVC. *Id.* at 20. Nor does the AVC "create any private right, cause of action or remedy for any third party with respect to the acts and practices covered herein." *Id.* at 15.

In October 2020, CenturyLink, Inc. submitted a "short-form" application to the Rural Digital Opportunity Fund ("RDOF") auction in Oregon. Shannon Decl. ¶¶ 3, 5. The RDOF is a program established by the Federal Communications Commission ("FCC") to expand high-speed internet access in rural communities. *Id.* ¶ 3. RDOF auctions proceed in two phases: first, an eligibility phase based on a short-form application; and second, a more comprehensive phase based on a "long-form" application used to decide whether the applicant qualifies for RDOF funding. *Id.* ¶ 4 & Ex. 1. Holding companies may submit short-form applications with the "inten[t] to assign [their] winning bids" either "to multiple operating companies in a state" or to "one of those entities to be the lead operating company." *Id.* at Ex. 1 at 6. "In such circumstances, the winning bids should be assigned to that lead operating company, the long-form application should be filed in the name of the lead operating company, the letter of credit should be in the name of the lead operating company, and payments will be made to . . . the lead operating company." *Id.* "[T]he long-form application must identify which operating companies will meet the public interest obligations[.]" *Id.* Additionally, if "[a] winning bidder . . . assigns some or all of its winning bids to a related entity," the winning bidder "must make a number of certifications," including acknowledging the

assignment, that the winner will inform the entity of its filing obligations, and that the winning bidder "will be at risk for default if any of the related entities do not submit a timely . . . long-form application." *Id.* CenturyLink, Inc. submitted its "short-form application in its capacity as a holding company, with the understanding that any successful bids from the RDOF auction would be assigned to and performed by one of its subsidiaries in Oregon." *Id.* ¶ 5.

CenturyLink, Inc. submitted bids for locations in Oregon in October and November 2020. *Id.* ¶ 6. On December 7, 2020, both bids were accepted. *Id.* CenturyLink, Inc. then assigned those winning bids to one of its subsidiaries, Qwest Corporation. *Id.* ¶ 7. Qwest Corporation then "submitted the long-form application associated with those winning bids." *Id.* "On May 12, 2022, the FCC issued a public notice . . . authorizing funding for winning bids," including to Qwest Corporation. *Id.* ¶ 8 & Ex. 2 at 48-51. Neither CenturyLink, Inc. nor Lumen received any funding or provided any services in connection with the winning bids. *Id.* ¶ 9.

          b.     Lumen

While the long-form application was pending, CenturyLink, Inc. amended its articles of incorporation and formally changed its name to Lumen Technologies, Inc. Randazzo Decl. ¶ 4. Like its predecessor, Lumen is incorporated in and maintains its principal place of business in Louisiana. *Id.* ¶ 5. Lumen is a publicly traded holding company that has an ownership interest in more than 200 companies, corporations, and legal entities around the world. *Id.* ¶¶ 6-7. Some of these entities are directly owned by Lumen and some are owned indirectly. *Id.* ¶ 6. Lumen maintains separate financial, accounting, corporate, and other official records from its subsidiaries and separately maintains all debts, financial obligations, funds, and assets. *Id.* ¶ 9. Lumen itself is controlled by an eleven-member board of directors, ten of whom are independent of Lumen. *Id.* ¶ 10. Lumen is registered to do business in Oregon, but Lumen does not: own, lease, or possess any real or personal property in Oregon; have any employees, officers, or directors in Oregon; maintain any financial accounts in Oregon; maintain any officers or physical presence within Oregon; or provide internet services in Oregon or any other state. *Id.* ¶¶ 11-18. Additionally, Lumen is not licensed to perform any form of internet services in Oregon. *Id.* ¶ 18.

**B.**     **Factual Background Allegations[2]**

CenturyLink is one of the country's largest internet services providers.  FAC ¶¶ 24-25.  It offers, among other things, "network services, cloud storage, and Internet connectivity services to residential and business consumers."  *Id.* ¶ 24.  CenturyLink provides internet services in sixteen states, including Oregon. *Id.* ¶ 25.

In 2017, CenturyLink began offering a new internet service program called "Price For Life."  *Id.* ¶ 27.  Customers who selected this plan entered into contracts with CenturyLink, which provided that CenturyLink would not increase prices "so long as the customer remained in good standing, made payments on time, maintained service at the same residential address without suspension or disconnection, and did not change their CenturyLink service plan."  *Id.* ¶ 29.  This meant customers would keep their set internet price, with no price hikes, for however long they kept their Price For Life plan.  *Id.* ¶ 28.  CenturyLink marketed this program to customers across the country, including in Oregon, through 2022.  *Id.* ¶¶ 27, 30.

In 2023, "CenturyLink unceremoniously raised the price of residential Internet services" without providing advance notice to many of its Price For Life customers.  *Id.* ¶ 31.  In advance of this change, CenturyLink posted on its website a question-and-answer addressing the Price For Life promotion.  *Id.* ¶ 32. The question read: "'Will I see an increase in my High-Speed Internet charge if I have a current Price For Life promotion?'"  *Id.*  The website answered: "'No, the High-Speed Internet monthly recurring charge for customers with the Price For Life promotion will not change.'"  *Id.*  Many Price For Life customers (e.g., plaintiffs) nonetheless complained that they had their prices raised in violation of their contracts.  *Id.*  In response to these complaints, CenturyLink told customers—as well as the Oregon DOJ and the FCC—that it had stopped offering Price For Life in October 2019.  *Id.* ¶ 33.

At some point during this period, CenturyLink also began migrating customers to Quantum Fiber. *Id.* ¶ 34.  For some of these migrations, CenturyLink simply terminated the customer's original services.

---

[2] The following allegations are based on plaintiffs' first amended complaint.  The Court assumes the truth of these allegations for purposes of addressing defendants' motion to dismiss under Rule 12(b)(6) only.

*Id.* For others, CenturyLink first increased the CenturyLink services price by an additional five dollars and then, when customers complained, allowed those customers to switch to Quantum Fiber. *Id.* ¶ 35.

Plaintiffs are three CenturyLink customers who seek to represent a nationwide class and an Oregon subclass. *Id.* ¶¶ 37-39, 42-43. Haagenson discovered in September 2021 that CenturyLink had mistakenly decreased his internet speed. *Id.* ¶¶ 13, 39. To rectify this error, CenturyLink offered Haagenson Price For Life protections, which he accepted. *Id.* However, in June 2023, CenturyLink tried to charge Haagenson an additional ten dollars over the monthly rate established by the terms of his Price For Life contract. *Id.* ¶ 39. Haagenson disputed this increase with CenturyLink the Oregon DOJ, Oregon Public Utilities Commission, and FCC. *Id.* In response to these disputes, CenturyLink claimed that Haagenson had signed up for a new account in 2021 and thus canceled his Price For Life agreement at that time. *Id.* Haagenson canceled his CenturyLink service thereafter. *Id.*

Rosing subscribed to Price For Life in February 2022. *Id.* ¶ 11. However, in May 2023, CenturyLink increased Rosing's monthly bill by ten dollars without first providing notice to Rosing. *Id.* ¶ 37. Rosing disputed the increase with CenturyLink and the Oregon DOJ. *Id.* CenturyLink denied that Rosing ever subscribed to the Price For Life program and claimed that Rosing's service plan offered no protection against price increases. *Id.*

Finally, Civelli subscribed to Price For Life in June 2021. *Id.* ¶ 12. Like Rosing, CenturyLink increased Civelli's monthly bill by ten dollars per month in July 2023, again without first providing notice. *Id.* ¶ 38. Also like Rosing, Civelli disputed the increase with CenturyLink and the Oregon DOJ. *Id.* CenturyLink again denied that Civelli ever subscribed to the Price For Life program and claimed that his service plan did not include protections against future price increases. *Id.*

## C.    Procedural Background

Plaintiffs initiated this action on November 24, 2023. Compl., ECF 1. Lumen filed an initial motion to dismiss on March 26, 2024, ECF 27, and plaintiffs voluntarily dismissed Lumen thereafter to pursue jurisdictional discovery, ECFs 35, 37. On June 24, 2025, plaintiffs filed the operative first amended complaint, renaming Lumen as a defendant, *see* FAC. On August 5, 2025, defendants filed the present

motion to dismiss.  Defs. Mots., ECF 62.  Plaintiffs timely responded in opposition on September 2, 2025.

Pls. Resp., ECF 69.  Defendants timely filed a reply in support of their motion on September 30, 2025.

Defs. Reply, ECF 73.

## DISCUSSION

**A.    Lumen's Motion to Dismiss for Lack of Personal Jurisdiction**

Plaintiffs have not met their burden of establishing that the Court has personal jurisdiction over

Lumen.  Because this is a diversity action, the Court looks to Oregon law to determine whether it has

personal jurisdiction over the defendants.  *Boschetto*, 539 F.3d at 1015 ("When no federal statute governs

personal jurisdiction, the district court applies the law of the forum state.").  "Oregon's long-arm statute

confers jurisdiction to the extent permitted by due process."  *Gray & Co. v. Firstenberg Mach. Co.*, 913

F.2d 758, 760 (9th Cir. 1990) (per curiam).  Thus, for this Court's "purposes, jurisdiction under state law

and due process are coextensive."  *Davis v. Cranfield Aerospace Sols., Ltd.*, 71 F.4th 1154, 1161 (9th Cir.

2023).

A court has personal jurisdiction over a defendant when the defendant has "such 'contacts' with

the forum State that 'the maintenance of the suit' is 'reasonable, in the context of our federal system of

government,' and 'does not offend traditional notions of fair play and substantial justice.'"  *Ford Motor

Co. v. Mont. 8th Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S.

310, 316-17 (1945)).  The emphasis on defendants' contacts with the forum has "led to [the Supreme Court]

recognizing two kinds of personal jurisdiction: general (sometimes called all-purpose) jurisdiction and

specific (sometimes called case-linked) jurisdiction."  *Id.*  Plaintiffs concede that the Court does not have

general personal jurisdiction over Lumen.  Pls. Resp. 13 (all references to ECF pagination).  Accordingly,

the only question is whether the Court has specific jurisdiction over Lumen.  The evidence and pleadings

show that it does not.

The Ninth Circuit analyzes specific jurisdiction using a three-prong test:

(1) The non-resident defendant must purposefully direct his activities or consummate some
transaction with the forum or resident thereof; or perform some act by which he
purposefully avails himself of the privilege of conducting activities in the forum, thereby

invoking the benefits and protections of its laws;

(2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

(3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802 (quoting *Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987)). "The plaintiff bears the burden of meeting the first two prongs while the defendant shoulders the burden on the final prong." *Davis*, 71 F.4th at 1162.

How courts assess the first prong is typically determined by whether the case sounds in contract or tort. *See id.* When a case sounds in contract, courts generally apply the "purposeful availment" test. *Id.*; *Herbal Brands, Inc. v. Photoplaza, Inc.*, 72 F.4th 1085, 1090 (9th Cir. 2023). Courts generally apply the "purposeful direction" test when the case sounds in tort. *Davis*, 71 F.4th at 1162; *Herbal Brands*, 72 F.4th at 1090. "Although they are distinct, 'at bottom, both purposeful availment and purposeful direction ask whether defendants have voluntarily derived some benefit from their interstate activities such that they 'will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts.'" *Herbal Brands*, 72 F.4th at 1090 (quoting *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1107 (9th Cir. 2020). Accordingly, there is "no need to adhere to an iron-clad doctrinal dichotomy to analyze specific jurisdiction." *Davis*, 71 F.4th at 1162. Courts should instead "comprehensively evaluate the extent of the defendant's contacts with the forum state and those contacts' relationship to the plaintiffs' claims—which may mean looking at both purposeful availment and purposeful direction." *Id.* Such is the case here. Oregon's jurisdiction over Lumen is lacking under either test. Additionally, while this Court does have specific jurisdiction over certain subsidiaries of Lumen's, plaintiffs have not demonstrated that those subsidiaries' jurisdictional ties should be imputed onto Lumen.

1.      *Purposeful Availment*

Plaintiffs have not shown that Lumen purposefully availed itself of Oregon law. "[A] contract alone does not automatically establish minimum contacts in the plaintiff's home forum." *Boschetto*, 539 F.3d at 1017. To establish personal availment, the plaintiff must instead show "actions by the defendant

10

*himself* that create a 'substantial connection' with the forum State." *Burger King v. Rudzewicz*, 471 U.S. 462, 475 (1985). (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957) (emphasis in original)). Courts consider several factors in making this assessment: (1) "the terms of the contract," (2) "contemplated future consequences," (3) "prior negotiations," and (4) "the parties' actual course of dealing." *Id.* at 479. If these factors, taken together, demonstrate that a defendant purposefully availed itself of the privilege of doing business in the forum state, then the first prong of the specific personal jurisdiction test is satisfied. *See id.*

Two contracts lie at the center of the parties' personal availment dispute: the AVC and the short-form RDOF application. The AVC is a nonstarter. By its plain terms, the AVC is "inadmissible in any case for any purpose" and cannot be "used to support any claim, cause of action, right asserted or request for relief of any kind in any action" except in an action by the parties to the AVC to enforce the terms of the AVC. AVC 4. Plaintiffs are not parties to the AVC and, as private citizens, cannot endeavor to enforce it. *See id.* at 16 (granting the Oregon DOJ enforcement authority over the AVC); *see also Alefosio v. Hawaii Equal Emp. Opportunity Comm'n*, No. CV 24-00329 JMS-RT, 2025 WL 1449029, at *2 (D. Haw. May 1, 2025) (finding government consent decree did not establish jurisdiction in action by nonparty incidental beneficiaries), *appeal dismissed*, No. 25-3218, 2025 WL 3439623 (9th Cir. Sept. 17, 2025). Plaintiffs cannot rely on the AVC to satisfy their burden here.

The short-form RDOF application is also insufficient to show personal availment. It is true that Lumen's predecessor—which the Court will just call Lumen now for the sake of simplicity—entered into a contract concerning business in Oregon. But, again, the mere fact of a contract is not enough to establish jurisdiction over a nonresident. *Glob. Commodities*, 972 F.3d at 1108. A contract between a defendant and a resident of the forum does not establish jurisdiction where "the business relationship between the parties [is] fleeting or its center of gravity [lies] elsewhere." *Id.* Courts take "a highly realistic approach" in making this assessment, ultimately considering "prior negotiations and contemplated future consequences, along with the terms of the contract, and the parties' actual course of dealing." *Burger King*, 471 U.S. at 479 (citation and quotation marks omitted). These factors show that Lumen's connection with Oregon was

11

fleeting.

Prior negotiations are of no help because there is no indication that any occurred. The contract terms are a little more helpful. Courts typically ask whether the contract invokes the laws of a particular forum and whether any of the contract's terms are tied to a specific location (i.e., whether the contract contains, for example, a choice of law provision or forum selection clause). *See Davis*, 71 F.4th at 1164. The Court cannot realistically draw its own conclusion as to the first question because the contract itself has not been submitted for the Court's review. Based on the evidence submitted, consideration of the second question suggests that the contract terms favor a jurisdictional finding. Lumen's short-form application was submitted "with the understanding that any successful bids from the RDOF auction would be assigned to and performed by one of [Lumen's] subsidiaries in Oregon." Shannon Decl. ¶ 5. Lumen also "submitted bids for locations in Oregon" specifically, again tying the contract's terms to the forum state. *Id.* ¶ 6.

That said, the contemplated consequences extinguish that connection. As noted above, Lumen submitted the short-form application with the intention of assigning any successful bids to its subsidiaries. *Id.* ¶ 5. Assignments like Lumen's are expressly contemplated by the RDOF procedures, which allow subsidiaries to submit long-form applications after parent companies win short-form application bids. *Id.* at Ex. 1 at 6. Under the regulations, parent companies that assign their winning bids must inform the subsidiary of its filing obligations, acknowledgment the assignment, make specified certifications, and accept the risk of default if the subsidiary fails to submit the long-form application. *Id.* None of those obligations tie the assigning parent company to Oregon in any substantial way. The evidence thus shows that Lumen did not contemplate any lasting or substantial relationship with Oregon when it submitted its short-form application—it contemplated handing that all over to its subsidiary. The contemplated consequences counsel against finding jurisdiction.

Any remaining questions are answered by the actual course of dealing. As intended, Lumen assigned its winning bid to its subsidiary and the subsidiary then submitted a long-form application, won funding authorization, and received said funding. *See id.* ¶¶ 7-9 & Ex. 2. Lumen received no funding and

provided no services in connection with its winning bids. *Id.* ¶ 9.  The short-form RDOF application, when considered among the entire course of the parties' dealings, does not show that Lumen purposefully availed itself of Oregon law.

    2.    *Purposeful Direction*

Plaintiffs have also failed to show that Lumen purposefully directed activities toward Oregon. Courts analyzing purposeful direction look to the "effects test" from *Calder v. Jones*, 465 U.S. 783 (1984). *E.g. Davis*, 71 F.4th at 1162.  The effects test "requires that the defendant allegedly have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Schwarzenegger*, 374 F.3d at 803 (quoting *Dole Food v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002)).

To satisfy the first element, "the defendant must act with the 'intent to perform an actual, physical act in the real world.'" *Picot*, 780 F.3d at 1214 (quoting *Schwarzenegger*, 374 F.3d at 806).  Lumen has intentionally acted by submitting its short-form application.[3]  That application concerned projects specifically within Oregon and thus was aimed at the forum state.  But there is no evidence that the application caused any harm within Oregon, let alone harm that Lumen knew was likely to arise.  Harm may have arisen from the work Qwest Corporation conducted after it submitted the long-form application, won the funding, and used that funding to provide internet services.  But that was Qwest Corporation, not Lumen, and the evidence before the Court does not show that Lumen purposefully directed any activities toward Oregon.

    3.    *Imputed Liability*

Of course, certain of Lumen's subsidiaries, such as Qwest Corporation, may have personally availed themselves of Oregon law and purposefully directed their activities to Oregon.  But plaintiffs have not shown that these subsidiaries' connections should be imputed to Lumen.  "As a general principle, corporate separateness insulates a parent corporation from liability created by its subsidiary,

---

[3] For the reasons described above, the AVC is not a valid basis for showing Lumen purposefully directed its activities toward Oregon.

notwithstanding the parent's ownership of the subsidiary." *Ranza*, 793 F.3d at 1070. Even a close association between a parent company and a subsidiary is insufficient to impute the subsidiary's contacts onto its parent. Imputation is only appropriate where the subsidiary and parents are "alter egos." *See Cox v. CoinMarketCap OPCO, LLC*, 112 F.4th 822, 835 (9th Cir. 2024). Under the "alter ego" test, a plaintiff must "make out a prima facie case (1) that there is such unity of interest and ownership that the separate personalities of the two entities no longer exist and (2) that failure to disregard their separate identities would result in fraud or injustice." *Id.* (cleaned up). Nothing in plaintiffs' submissions meets that high bar.

According to a Manager of Legal Operations for one of Lumen's subsidiaries, Lumen "does not exercise any control or discretion over the day-to-day operations of its hundreds of subsidiaries." Randazzo Decl. ¶ 10. Nor does Lumen "make, use or sell any of its own products or services in Oregon." *Id.* ¶ 15.

Plaintiffs argue that Lumen does in fact play an active role as evidenced by emails and Better Business Bureau ("BBB") complaint responses authored by Lumen employees. *See* Pls. Resp. 19; Decl. of Robert Devling Supp. Pls. Resp. ("Devling Decl."), ECF 70, at ¶¶ 2-6 & Exs. 1-5. In support of this argument, plaintiffs submit several emails sent from persons with Lumen email addresses (e.g., john.doe@lumen.com). Devling Decl. Exs. 1-5. Some identify the same person with both a Lumen email address and a CenturyLink address. *See, e.g.*, *id.* at Ex. 1 at 2-3. Others show the Lumen logo on the emails. *See, e.g.*, *id.* at Ex. 1 at 6. Some contain both at once—for example, an email sent from a Lumen email address, bearing the Lumen logo, with the signature block showing the employee's title as "Lead Project Manager" for "CenturyLink Transformation & Support." *Id.* at Ex. 2 at 3-4. Plaintiffs also submit a series of BBB complaints directed to CenturyLink. *Id.* ¶ 7 & Ex. 6. Many of these complaints show responses which state CenturyLink's acknowledgment of the customers' concern. *See, e.g.*, *id.* at Ex. 6 at 15, 21, 23-24. Some of these responses include signature blocks showing that they are authored by members of the "Customer Advocacy Group" of "Lumen." *Id.* at Ex. 6 at 15-16. A couple responses additionally state that "Lumen provides service to this area under the mass market product and service names, CenturyLink and Quantum Fiber." *Id.* at Ex. 6 at 22, 24.

In response, Lumen submitted another declaration by the same Manager of Legal Operations

14

providing that "[n]one of the individuals listed in" plaintiffs' submissions are Lumen employees.  Decl. of Joan Randazzo Supp. Defs. Reply, ECF 74, at ¶¶ 4, 6.  "Rather, each of the individuals was employed by a subsidiary of Lumen . . . at the time the documents were written."  *Id.* ¶ 4.  She further explains that many Lumen subsidiaries "are authorized to use the 'Lumen' brand and may use that or a derivative thereof as their trade name," but that "[t]he use of such branding does not reflect any person's status as an employee of Lumen."  *Id.* ¶ 5.

Lumen's evidence makes clear that it is not an alter ego for its subsidiaries.  While the Court must resolve conflicting evidence in plaintiff's favor, the evidence here is not conflicting.  At most, the explanations provided in Lumen's affidavits conflict with plaintiff's allegations—but not plaintiff's affidavits or other submitted evidence.  Moreover, even if the Court were to disregard Lumen's evidence altogether, plaintiffs have not put forth enough to show that Lumen "dictates every fact of [its subsidiaries'] business, including routine matters of day-to-day operation."  *Ranza*, 793 F.3d at 1074.  A few emails and BBB complaint responses do not meet the high threshold of showing an alter ego relationship.

Altogether, plaintiffs have not met their burden of showing this Court has jurisdiction over Lumen.  Because there is neither purposeful availment nor purposeful direction, the Court does not reach the additional personal jurisdiction requirements.  Lumen's motion to dismiss for lack of jurisdiction is granted, and the claims against Lumen are dismissed without prejudice.

**B.     Defendants' Motion to Dismiss for Failure to State a Claim**

1.     *UDCPA*

Plaintiffs have sufficiently stated their unfair debt collection practices claim.  "The UDCPA aims to protect consumers from unfair collection practices."  *Miler v. TD Bank USA, Nat'l Ass'n*, No. 3:20-cv-00340-IM, 2022 WL 462119, at *2 (D. Or. Feb. 15, 2022).  Debt collectors are prohibited from engaging in certain practices under UDCPA, including, as relevant here, attempting or threatening to "enforce a right or remedy while knowing or having reason to know that the right or remedy does not exist," ORS § 646.639(2)(k); representing that a "debt may be increased by . . . fees or charges if the fees or charges may not legally be added to the existing debt," *id.* § 646.639(2)(m); collecting or attempting to collect

15

"interest or other charges or fees that exceed the actual debt" and are not authorized by law or the original contract, *id.* § 646.639(2)(n); and collecting, attempting to collect, or threatening to collect a debt that the debt collector reasonably should know "does not exist or is not owed by the debtor," *id.* § 646.639(2)(s). A "debt collector" is defined under the statute as "a person that by direct or indirect action, conduct or practice collects or attempts to collect a debt owed, or alleged to be owed, to a creditor or debt buyer." *Id.* § 646.639(1)(h).  A "debt" is merely "an obligation or alleged obligation that arises out of a consumer transaction." *Id.* § 646.639(1)(f).

Defendants point to a paragraph of plaintiffs' complaint which largely recites these standards and argue that plaintiffs merely "parrot the UDCPA." *See* Defs. Mot. 26-27[4] (quoting FAC ¶ 63).  Alone, that cited paragraph would be insufficient to withstand defendants' attack.  However, elsewhere in the first amended complaint, plaintiffs do provide additional support for these allegations.  Plaintiffs allege that CenturyLink entered into agreements with its Price For Life customers promising a certain fee and then demanded payments greater than the agreed-upon amount.  *See* FAC ¶¶ 29-36.  They thus allege that the case concerns an obligation arising out of a consumer transaction—the internet service fee—that CenturyLink is attempting to collect upon through the enumerated unlawful methods.  That is just enough to avoid dismissal.[5]

> 2. *Unjust Enrichment*

Plaintiffs' unjust enrichment claim may also stand at this time.  Defendants argue this claim is legally incognizable because it is based on valid, enforceable contracts, and that plaintiffs may therefore assert only contract claims.  *See* Defs. Mot. 28-29.  Plaintiffs respond that the validity of the underlying

---

[4] Citations are to ECF pagination.

[5] In a footnote, defendants alternately ask the Court to order plaintiffs to supplement their pleading under Federal Rule of Civil Procedure 12(e).  *See* Defs. Mot. 27 n.6.  But motions under Rule 12(e) "must point out the defects complained of and the details desired." Fed. R. Civ. P. 12(e).  Defendants do neither.  While the allegations supporting plaintiffs' UDCPA claim are admittedly light, they are enough to put defendants on notice and to allow defendants to respond. *See Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 514 (2002). Defendants' alternate request under Rule 12(e) is thus denied.

contracts has not been established and that alternative pleading is appropriate at this stage. *See* Pls. Resp. 29-30. Quantum meruit claims, or claims for unjust enrichment, are mutually exclusive with claims for breach of express contract. *Glob. Exec. Mgmt. Sols., Inc. v. Int'l Bus. Machines Corp.*, 260 F. Supp. 3d 1345, 1378 (D. Or. 2017) (citing *Ken Hood Constr. Co. v. Pac. Coast Constr., Inc.*, 203 Or. App. 768, 772, 126 P.3d 1254 (2006)). But Oregon law allows a plaintiff to plead both in the alternative "'when any doubt exists regarding the existence or enforceability of an express contract, or when the express contract fails to provide the basis for payments to be made under the contract.'" *Id.* (quoting *Kashmir Corp. v. Patterson*, 289 Or. 589, 592, 616 P.2d 468 (1980) (Tongue, J., concurring)). Doubts remain about the validity, enforceability, and terms of the underlying contracts here. *See, e.g.*, CenturyLink Communications, LLC Ans. to Compl., ECF 29, at 2 (denying all the allegations in the complaint relating to unjust enrichment). Defendants' motion to dismiss the unjust enrichment claim is therefore denied. Defendants may renew this challenge at a later stage of the case if appropriate.[6]

## CONCLUSION

For the reasons stated herein, defendants' motion to dismiss, ECF 62, is GRANTED in part and DENIED in part. Specifically, Lumen's motion to dismiss for lack of personal jurisdiction is GRANTED, and all claims against Lumen are DISMISSED without prejudice. Defendants' motion to dismiss is otherwise DENIED.

IT IS SO ORDERED.

DATED this 30th day of March, 2026.

Adrienne Nelson
United States District Judge

---

[6] Defendants argue that "Plaintiffs implicitly concede that their unjust enrichment claim fails if Defendants, in their forthcoming answers, admit that Plaintiffs entered into valid, high-speed internet subscriber agreements." Defs. Reply 14. The Court declines to reach this argument here because, at this time, the question of what defendants may include in their forthcoming answers remains speculative.